JOEL KOZBERG (Bar No. 90197)
jkozberg@kozberglaw.com
KOZBERG & BODELL LLP
1801 Century Park East, 16th Floor
Los Angeles, CA 90067
Telephone : (310) 553-1333
Facsimile : (310) 553-1303

Attorneys for Plaintiff
HAR-CMBS I, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| HAR-CMBS I, LLC,<br><br>                    Plaintiff,<br><br>v.<br><br>NATIN PAUL: and NATIN PAUL AS TRUSTEE OF THE NATIN PAUL MANAGEMENT TRUST DATED FEBRUARY 29, 2012,<br><br>                    Defendants. | Case No.  2:22-CV-02104<br><br>**COMPLAINT FOR BREACH OF WRITTEN GUARANTY** |

**COMPLAINT FOR BREACH OF WRITTEN GUARANTY**

Plaintiff HAR-CMBS I, LLC ("Plaintiff" or HAR-CMBS") hereby complains and alleges against Defendant Natin Paul, individually, and as the Trustee of the Natin Paul Management Trust Dated February 29, 2022 ("Defendants") as follows:

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332. Plaintiff is a Delaware limited liability company the sole member of which is a citizen of California. Defendant is a citizen of the State of Texas. As alleged more fully below, the amount in controversy herein is more than $75,000, exclusive of interest and costs of court.

2.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because, as alleged more fully below, Plaintiff and Defendant agreed in writing that the exclusive venue for the claims alleged herein shall be this District and this Court has personal jurisdiction over the parties.

## PARTIES

3.     Plaintiff HAR-CMBS I, LLC, is a Delaware limited liability company the principal office of which is located in Los Angeles, California. The sole member of Plaintiff is domiciled in Los Angeles and is a citizen of the State of California. HAR-CMBS invested significant sums of money in and is the sole "Class B Member" of World Class CMBS I MM, LLC (the "Company"). HAR-CMBS is the holder of a written guaranty in its favor, dated December 7, 2016, pursuant to which Defendants unconditionally guaranteed the full repayment of the monies invested by HAR-CMBS in the Company, including but not limited to HAR-CMBS's capital contribution, plus preferred returns, and all other amounts payable to HAR-CMBS pursuant to the operating agreement of the Company.

3.     Upon information and belief, Defendant Natin Paul is an individual and a citizen of the State of Texas. Defendant is named herein in his individual capacity, and separately as the Trustee of the Natin Paul Management Trust Dated February 29, 2012.

**COMPLAINT FOR BREACH OF WRITTEN GUARANTY**

# FACTS

4.    On or about December 7, 2016, the Limited Liability Company Agreement of the Company (the "Operating Agreement") was executed by World Class Holdings, LLC as its Managing Member (the "Managing Member"), and HAR-CMBS as the Class B Member of the Company. A true and accurate copy of the Operating Agreement is attached hereto as Exhibit 1.  Pursuant to the Operating Agreement, $30,000,000.00 was invested by HAR-CMBS as the "Initial Capital Contribution" for the Class B membership interest in the Company. The Company was to serve as the managing member of World Class CMBS I, LLC, which in turn was formed to acquire E, F, G, and H classes of bonds of Wells Fargo Commercial Mortgage Trust 2016-LC25 (the "Property").

5.    Further, on or about December 7, 2016, Defendants signed a written Guaranty (the "Guaranty"), a true and accurate copy of which is attached hereto as Exhibit 2, to induce HAR-CMBS to make the Initial Capital Contribution to the Company. Pursuant to the Guaranty, Defendants, unconditionally, jointly and severally, guaranteed to HAR- CMBS the repayment of the $30,000,000.00 Initial Capital Contribution, full payment of the Preferred Return required by the Operating Agreement, and the full performance of the Company's payment Obligations to HAR-CMBS under the Operating Agreement (referred to in the Guaranty as the "Indebtedness" and as the "Guaranteed Obligations"). The Guaranteed Obligations are payable to HAR-CMBS by each of the Guarantors immediately upon demand in the event of any default of the Company with respect to the Indebtedness and, in the event of a failure to repay the Initial Capital Contribution, as and when required by the Operating Agreement.

6.    Pursuant to Section 1(a) of Appendix B ("Appendix B") of the Operating Agreement, the Company was required to make certain payments to HAR-CMBS. The Company was required to make monthly distributions to HAR-CMBS of the Class B Preferred Return in the amount of $450,000.00. HAR-CMBS,

**COMPLAINT FOR BREACH OF WRITTEN GUARANTY**

as the Class B Member, was permitted to withhold $1,350,000.00 from its Initial Capital Contribution provided to the Company, which HAR-CMBS could apply in the event the Company failed to pay the required monthly distribution. The Company was required to pay the total unpaid and outstanding Class B Invested Capital to HAR-CMBS (the sole Class B Member) no later than December 7, 2018. Effective July 25, 2019, the Operating Agreement was amended in writing by the Managing Member and HAR-CMBS to change the Class B Invested Capital to the Class B Member final repayment date to not later than August 7, 2020 (the "Amendment"). A true and accurate copy of the Amendment is attached hereto as Exhibit 3.

7.     The Company failed to make the required monthly distributions to HAR-CMBS beginning in January 2020.

8.     By April 2020, HAR-CMBS had applied to the due but unpaid monthly distributions of the Company the entirety of the $1,350,000.00 withheld from its Initial Capital Contribution.

9.     Thereafter, because of the continuing failure by the Company to make the required monthly distributions, HAR-CMBS made written demands (the "Notices of Failure to Pay") to the Company to make the missed distributions. True and accurate copies of the Notices of Failure to Pay collectively are attached as Exhibit 4. Defendants were provided with the Notices of Failure to Pay. Despite HAR-CMBS's Notices of Failure to Pay, the Company failed to timely repay the missed monthly distributions or replenish the reserve, all of which was required pursuant to Appendix B of the Operating Agreement.

10.     As a result, on July 6, 2020, HAR-CMBS provided to the Company Notice of Default, declaring a "Company Default" pursuant to Section 2 of Appendix B of the Operating Agreement. A true and accurate copy of the Notice of Default is attached hereto as Exhibit 5. Defendants were provided with the Notice of Default. Thereafter, the Company failed to pay the balance of the Class B Invested

**COMPLAINT FOR BREACH OF WRITTEN GUARANTY**

Capital, which payment was required not later than August 7, 2020, pursuant to the Amendment. By reason of the Company Default and the failure to pay the balance of the Class B Invested Capital, HAR-CMBS is entitled to all remedies provided by Sections 2(a), 2(b) and 5(b) of Appendix B of the Operating Agreement. Section 2(a) of Appendix B specifically provides that after a Company Default, HAR-CMBS may proceed directly with claims under the Guaranty against Defendants. Such Guaranty claims are to recover all monies payable to the HAR- CMBS, including but not limited to: (i) the then outstanding Invested Capital; (ii) plus the Class B Preferred Return earned to such date; (iii) plus all Additional Class B Payments (if any) that are owing under Appendix B. In addition, under Appendix B and the Guaranty, HAR- CMBS is entitled to recover all actual, reasonable, out-of-pocket expenses, costs and fees (including reasonable attorneys' fees and costs) arising from the Company's failure to make all payments due. The Company Default remains uncured.

### **FIRST CLAIM FOR RELIEF**

**Breach of Written Guaranty Against Defendants**

11.     Plaintiff repeats, realleges and incorporates by reference the allegations of Paragraphs 1 through 10 above, as if fully set forth herein.

12.     Pursuant to the Guaranty and by reason of the Company's default, Defendants were required to pay to Plaintiff all amounts owing to Plaintiff pursuant to the terms of the Operating Agreement. Despite demand by Plaintiff, Defendants have failed and refused to pay the amounts due pursuant to the Guaranty and Defendants are in breach thereof.

13.     Plaintiff has performed all duties and obligations required of it by the Operating Agreement and the Guaranty except as excused or waived by Defendants and the Company.

14.     By reason of the breaches by Defendants of the Guaranty, Plaintiff has been damaged in an amount to be proven at trial, including repayment of the unpaid

COMPLAINT FOR BREACH OF WRITTEN GUARANTY

balance of the $30,000,000 Initial Capital Contribution, full payment of the Preferred Return due Plaintiff pursuant to the Operating Agreement, and performance of the other obligations of the Company pursuant to the Operating Agreement, which amount presently exceeds $11,000,000. In addition, Plaintiff shall recover all costs and expenses as provided by the Guaranty, including its attorney's fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.     For damages for breach of Guaranty in an amount in excess of $11,000,000 according to proof;

2.     For interest thereon;

3.     For costs of suit, including attorney's fees; and

4.     For such other and further relief as the Court deems just and proper.

DATED: March 30, 2022                    KOZBERG & BODELL LLP


By: _____
      */s/ Joel Kozberg*
      JOEL KOZBERG
      Attorneys for Plaintiff HAR-CMBS I, LLC

**COMPLAINT FOR BREACH OF WRITTEN GUARANTY**

# EXHIBIT 1

## WORLD CLASS CMBS I MM, LLC

## LIMITED LIABILITY COMPANY AGREEMENT

THIS LIMITED LIABILITY COMPANY AGREEMENT of World Class CMBS I MM, LLC (the "Company") is made and entered into as of December 7, 2016 (the "Effective Date"), by and between World Class Holdings, LLC (the "Managing Member"), and the Class B Member (as hereinafter defined).

### Article I.  General Provisions

Section 1.01.  Definitions.  For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)  Act.  "Act" means the Delaware Limited Liability Company Act, as in effect from time to time.

(b)  Agreement.  "Agreement" means this Limited Liability Company Agreement, as amended and/or restated from time to time.

(c)  Certificate.  "Certificate" means the Certificate of Formation for the Company and all amendments thereto as filed in the appropriate public offices within the State of Delaware.

(d)  Code.  "Code" means the Internal Revenue Code of 1986, as amended.

(e)  Member.  "Member" means each of the Class A Members and the Class B Member. "**Class A Member**" means (i) each **Person** (as hereinafter defined) named as a Class A Member on **Appendix "A"** attached hereto, and (ii) any other Persons who are admitted to the Company either as an additional or substitute Class A Member pursuant to and in accordance with the terms of this Agreement. As used herein, "**Class B Member**" means (1) each of the Persons named as a Class B Member on **Appendix "A"** attached hereto, and (2) any other Persons who are admitted to the Company either as an additional or substitute Class B Member pursuant to and in accordance with the terms of this Agreement.

(f)  Person.  "Person" means any natural person or any entity of any kind.

(g)  Promote Payments.  "Promote Payments" means the difference between (x) the distributions made to the Company in its capacity as managing member of World Class CMBS I, LLC pursuant to Sections 5.1, 5.2 and 11.4 of the World Class CMBS I Agreement (other than any distributions made to the Company in respect of any loans or capital contributions made by the Company to World Class CMBS I) as reduced by (y) such amounts as the Managing Member deems appropriate to pay, or set aside reserves for, expenses of the Company.

(h)  Property.  "Property" means the E, F, G and H classes of bonds of Wells Fargo Commercial Mortgage Trust 2016-LC25 with a face value of approximately $76,400,000.

(i)  Share of Profits and Losses.  The "Share of Profits and Losses" for each Member shall be as set forth on Appendix A hereto.

ACTIVE/80750130.1
4826-5796-9954

(j)     World Class CMBS I.  "World Class CMBS I" means World Class CMBS I, LLC, a Delaware limited liability company.

(k)     World Class CMBS I Agreement.  "World Class CMBS I Agreement" means the Limited Liability Company Agreement of World Class CMBS I, LLC, as amended and/or restated from time to time.

Section 1.02.   Company Name.  The Company shall do business under the name of "World Class CMBS I MM, LLC."

Section 1.03.   Fiscal Year.  Except as otherwise provided by the Code, the fiscal year of the Company shall be the calendar year, or such other fiscal year as the Managing Member shall designate.

Section 1.04.   Rights and Liability of Members.

(a)     The rights of the Members are set forth in this Agreement; provided, however, certain special rights, terms and conditions that shall apply as long as a Class B Member exists are set forth on **Appendix "B"** attached hereto and incorporated herein by this reference.  In the case of any conflict between the terms of this Agreement and the terms of **Appendix "B,"** the terms of **Appendix "B"** shall control.

(b)     No Member shall be liable to the Company for the repayment, satisfaction and discharge of its debts, liabilities and obligations except to the extent provided in the non-waivable provisions of the Act.  The rights and liabilities of the Members shall be as provided in the Act, except as expressly provided herein.  In the event of any inconsistency between any terms and conditions contained in this Agreement and any non-mandatory provisions of the Act, the terms and conditions of this Agreement shall govern.

Section 1.05.   Purposes and Powers.

(a)     The Managing Member hereby confirms the formation of the Company as of December 5, 2016 (the "Formation Date") as a limited liability company under and pursuant to the provisions of Delaware Limited Liability Company Law and all other pertinent laws of the State of Delaware for the purposes and upon the terms and conditions hereinafter set forth. Members hereto agree that the rights, duties, and liabilities of Members, and any additional Members admitted to the Company in accordance with the terms hereof, shall be as provided in Delaware Limited Liability Company Law, except as otherwise provided herein. The Managing Member further confirms that, from the Formation Date to the date of this Agreement, the Company has entered into no operating agreement and has conducted no activities.

(b)     The purpose of the Company is to serve as the managing member of World Class CMBS I, and to engage in any other activities necessary, related or incidental thereto. World Class CMBS I has been formed to acquire the Property.

(c)     The Company shall have and may exercise all of the powers that can be conferred upon and exercised by a limited liability company formed pursuant to the Act.

2

Article II.  Management of Company

Section 2.01.  Authority of Managing Member.  The management, operation and implementation of policy of the Company shall be, and hereby are, vested exclusively in the Managing Member who shall have full control of and shall manage the business and affairs of the Company.  The Managing Member shall have the power to exercise the powers, rights and authority granted to the Company hereunder on behalf and in the name of the Company.  In addition to the specific rights and powers granted herein, and subject to the terms and conditions contained herein, the Managing Member shall have all the powers and rights of a manager under the Act.

Section 2.02.  Intentionally Omitted.

Section 2.03.  Reliance by Third Parties.  Notwithstanding any other provision of this Article II, any third party dealing with the Company may rely conclusively upon the authority, power and right of the Managing Member acting under this Agreement.  This Section 2.03 shall not be deemed to limit the liabilities and obligations of the Managing Member as set forth in this Agreement.

Section 2.04.  Exculpation of Liability.  Neither the Managing Member, its owners nor any of their respective officers, partners, managers, members, directors, agents or other representatives (each an "Indemnified Party") shall be liable to the Company or the Members for any loss, liability, damage or expense (a "Loss") except for any Loss which is finally adjudicated by a court of competent jurisdiction to be primarily attributable to the gross negligence, willful malfeasance or fraud of such Indemnified Party in connection with its activities on behalf of the Company.

Section 2.05.  Indemnification.  The Company will indemnify the Indemnified Parties against all Losses to which any of such Persons may become subject in connection with the Company; provided, however, that indemnification shall not be paid hereunder to any such Person with respect to any Loss which is finally adjudicated by a court of competent jurisdiction to be primarily attributable to the gross negligence, willful malfeasance or fraud of such Indemnified Party in connection with its activities on behalf of the Company.

Article III.  Capital Contributions, Distributions, Allocations, Tax Matters, Expenses

Section 3.01.  Capital Contributions.  Concurrently herewith, the Members have contributed the amounts set forth on **Appendix "A"** attached hereto and incorporated herein by this reference. Subject to Section 3.04, the Members shall not be required to make any capital contributions to the Company. The Managing Member, in its sole and absolute discretion, may make capital contributions to the Company at such times and in such amounts and for such purposes as it deems advisable in its sole discretion.

Section 3.02.  Distributions; Allocations.  Subject to Section 3.04, all Promote Payments received by the Company shall be distributed among the Members in proportion to their respective Share of Profits and Losses.  All other amounts received by the Company from any source shall be distributed solely to the Managing Member.  All items of income, gain, loss and deduction attributable to the Promote Payments, as determined by the Managing Member in its sole discretion, shall be allocated among the Members in proportion to their respective Share of Profits and Losses.  All other items of income, gain, loss and deduction shall be allocated solely to the Managing Member.

Section 3.03.  Tax Matters.  The Managing Member will serve as the "Tax Matters Member" of the Company and will file all United States Federal, state or other income tax returns required of the

3

ACTIVE/80750130.1
4826-5796-9954

Company. The membership interests in the Company granted to the Members on the Effective Date are each intended to constitute a "profits interest" for federal income tax purposes and this Agreement shall be interpreted in a manner consistent with such intent. The Managing Member, in its capacity as Tax Matters Member, hereby appoints Armanino, LLP to serve as the accountant and prepare tax returns for the Company, for which services the Company shall pay at reasonable and customary fees for such accounting work. No other or additional accountant shall serve in this capacity unless approved by the Tax Matters Member in its sole and absolute discretion. Harvey Bookstein is the Managing Member of the Manager of the Class B Member, and is a Founding Partner of RBZ, LLP, a predecessor to Armanino, LLP.

Section 3.04. <u>Expenses</u>. To the extent that the Managing Member determines that there are not sufficient Promote Payments available to pay, or set aside reserves for, expenses of the Company, the Managing Member shall send a written capital call notice to each Member stating the total amount of equity capital being called to pay, or set aside reserves for, expenses of the Company (the "Call Amount"), each Member's pro rata share of such Call Amount (based on its Share of Profits and Losses), the intended use of such Call Amount and a due date for each Member to fund its pro rata share of such Call Amount, which shall be no less than **10** days after such notice is deemed to have been given pursuant to Section 7.03. In the event that a Member fails to pay its pro rata share of a Call Amount within such time period (such amount not funded, the "Default Amount"), then the other non-defaulting Member may elect to fund the Default Amount within **10** days after the deadline for the original. If the non-defaulting Member elects to fund any portion of the Default Amount then the total amount of the Call Amount funded by the non-defaulting Member (both its original pro rata share of the Call Amount which it funded and the portion of the Default Amount which it funded) shall be treated as a loan from the non-defaulting Member to the Company and shall be documented as such. Any such loan shall bear interest at **twelve percent (12%)** per annum and shall be repaid in full from Promote Payments prior to making any distributions of Promote Payments to the Members hereunder.

## Article IV. Withdrawal of Profits, Gains or Capital

Section 4.01. <u>Limitation on Withdrawal</u>. No Member shall be permitted to withdraw profits, gains or capital from the Company or withdraw as a Member without the prior written approval of the Managing Member, which approval may be withheld for any reason. Notwithstanding the foregoing, the Class B Member shall have the right to withdraw as a Member of the Company pursuant to the terms of **Appendix "B"** attached hereto.

## Article V. Transfer of Company Interests

Section 5.01. <u>Assignability of Interests; Substituted Members</u>. The interest of a Member shall not be assignable without the prior written consent of the Managing Member, which consent may be withheld in the Managing Member's sole discretion. No assignment shall be binding upon the Company until the Managing Member receives an executed copy of such assignment in form and substance satisfactory to the Managing Member in its sole discretion. No Member shall have the right to substitute an assignee as a Member in its place. The Managing Member shall have the power, in its discretion, to admit as a substituted Member any Person acquiring a Company interest by assignment from a Member. The admission of an assignee as a substituted Member shall be conditioned upon the assignee's written assumption of all obligations of the assigning Member, the assignee's execution of this Agreement as a Member and such other conditions as the Managing Member determines to be appropriate.

4

ACTIVE/80750130.1
4826-5796-9954

Article VI. Duration and Liquidation of Company

Section 6.01.   Duration.  The Company shall continue until the earlier of (x) the date on which the Company is terminated by mutual agreement of all of the Members, (y) the date it is required to terminate pursuant to applicable law or (z) the thirtieth (30th) day after the Managing Member ceases to be the managing member of World Class CMBS I and ceases to have any rights or obligations under the World Class CMBS I Agreement.

Section 6.02.   Withdrawal of Member.  In the event that any Member shall withdraw, die, be declared incompetent or insane, or be adjudicated a bankrupt, or in the event of the winding up or liquidation of a Member, such event shall not cause the dissolution of the Company, and the Company shall continue until dissolved pursuant to Section 6.01.

Section 6.03.   Liquidation.  Upon dissolution of the Company, the Company shall be liquidated in an orderly manner.  The Managing Member shall act as the liquidator to wind up the business and affairs of the Company pursuant to this Agreement.

Section 6.04.   Distribution Upon Liquidation.  On liquidation of the Company, the Managing Member shall make distributions out of the properties and assets of the Company in the following order of priority:

(a)   To the payment and discharge of the claims of all creditors of the Company who are not Members;

(b)   To the establishment of such reserves as the Managing Member may deem reasonably necessary or advisable in light of all the facts in order to provide for contingent liabilities of the Company to all persons who are not Members; and

(c)   The balance, if any, to the Members in accordance with Section 3.02.

Article VII. Miscellaneous

Section 7.01.   Admission of Members.  New Members may be admitted to the Company only with the consent of the Managing Member, which consent may be withheld for any reason in the Managing Member's sole discretion.

Section 7.02.   General.  This Agreement: (a) shall be binding on the legal successors of the Members permitted by this Agreement; (b) shall be governed by and construed in accordance with the laws of the State of Delaware, excluding its conflicts of laws provisions; (c) may be executed in more than one counterpart which together shall constitute the same agreement; and (d) contains the entire agreement among the Members relating to the subject matter hereof.  The waiver of any of the provisions, terms or conditions contained in this Agreement shall not be considered as a waiver of any of the other provisions, terms or conditions hereof.  For all purposes hereof, "business days" shall mean days other than Saturdays, Sundays or days on which commercial banks are closed in New York, New York.

Section 7.03.   Notices.  Any notice to be given hereunder (except for under Appendix "B", which will have its own Notice provisions) to any Member shall be deemed to have been given and received (i) when delivered in person to such Member, at the time of delivery, (ii) when mailed by registered or certified mail, within three business days of mailing and (iii) when sent by email, on the date of sending or the next business day after sending if the email is sent after 5:00 p.m. New York time, in

5

ACTIVE/80750130.1
4826-5796-9954

each case addressed to such Member at its address or email address set forth in <u>Appendix A</u>, or to such other address or email address as has been indicated to the Managing Member and circulated to all Members.

Section 7.04.   <u>Execution of Documents; Books and Records</u>.  The Members agree to execute such instruments, documents and papers as the Managing Member deems necessary or appropriate to carry out the provisions of this Agreement, and to take such other action as the Managing Member deems appropriate to maintain the Company's status as a limited liability company under the laws of the State of Delaware.

Section 7.05.   <u>Intentionally Omitted</u>.

Section 7.07.   <u>Amendments</u>.  The terms and provisions of this Agreement may be modified, amended or waived at any time and from time to time by the Managing Member in its sole discretion (including without limitation in connection with the admission of any new Members.

Section 7.08.   <u>Headings</u>.  Descriptive headings are for convenience of reference only, are not part of this Agreement, and shall not be considered in interpreting this Agreement.

Section 7.09.   <u>Gender and Number</u>.  For purposes of this Agreement the masculine gender shall be deemed to denote the feminine and the neuter, the singular to denote the plural and the plural to denote the singular, where the context so permits.

[Remainder of page intentionally left blank.]

ACTIVE/80750130.1
4826-5796-9954

6

IN WITNESS WHEREOF, the Managing Member and the Class B Member have entered into this Agreement as of the date first set forth above.

<u>MANAGING MEMBER:</u>

WORLD CLASS HOLDINGS, LLC
a Delaware limited liability company

By: _____
Name: Nate Paul
Title: President


**CLASS B MEMBER:**

**HAR-CMBS I, LLC,**
a Delaware limited liability company

By:     HAR-Managing Entity, LLC
        a California limited liability company
Its:    Manager

     By:    _____
          Harvey A. Bookstein as Trustee of the
          Harvey and Harriet Bookstein Living
          Trust u/d/t 8/11/99 for the benefit of
          Harvey A. Bookstein

     Its:    Managing Member

4826-5706-9954

## APPENDIX A

## CLASS A MEMBERS

| NAME OF MEMBER | ADDRESS | INITIAL CAPITAL CONTRIBUTION | SHARE OF PROFITS AND LOSSES |
|---|---|---|---|
| **Managing Member:** | | | |
| World Class Holdings, LLC | 401 Congress Avenue, 33rd Floor<br>Austin, Texas 78701<br>  Email: npaul@wccapitalgroup.com | $100 | 100.00% |

*[continued on next page]*

**APPENDIX "A"** (cont'd)

**CLASS B MEMBER**

| NAME OF MEMBER | ADDRESS | INITIAL CAPITAL CONTRIBUTION | SHARE OF PROFITS AND LOSSES |
|---|---|---|---|
| HAR-CMBS I, LLC | c/o Armanino, LLP<br>Attention: Harvey Bookstein<br>11766 Wilshire Boulevard, 9th Floor<br>Los Angeles, CA 90025<br>Lisa.Rom@ArmaninoLLP.com | $30,000,000.00 | Per Appendix "B" |

**APPENDIX "B"**

**Term and Conditions Applicable For Class B Member**

All the Members hereby agree that, until such time as (i) the Class B Member's initial capital contribution set forth on **Appendix "A"** ("**Class B Invested Capital**") is repaid to Class B Member by the Company in full, and (ii) all of the Additional Class B Payments (as defined in Section 2, below), if any, are paid in full by the Company to the Class B Member, the following terms shall apply; provided, however, upon the full repayment of such Class B Invested Capital, Class B Preferred Return (subject to the Minimum Preferred Return Payment (as defined below)) and all Additional Class B Payments (if any, as defined below), the terms of this **Appendix "B,"** other than Section 3 and Section 10, shall automatically become null, void and of no further force or effect:

1.   **Distributions/Payments**.

       a.    Distributions to Class B Members.  Notwithstanding anything to the contrary in the Agreement including, without limitation, Article III thereof, and the Act:  (i) the Company shall pay the then total unpaid and outstanding Class B Invested Capital to the Class B Member in full by no later than December 7, 2018 (the "**Class B Invested Capital Repayment Date**"); provided, however, such Class B Invested Capital Repayment Date can be extended for up to two periods of six (6) months each by the Company upon satisfaction of the following conditions precedent:  (A) delivery of a written notice by the Company to the Class B Member no later than thirty (30) days prior to the then current Class B Invested Capital Repayment Date providing that the Company has elected to extend the Class B Invested Capital Repayment Date; and (B) payment by the Company to the Class B Member, on or before the date occurring thirty (30) days prior to the then current Class B Invested Capital Repayment Date, of an amount equal to the product of the then outstanding Class B Invested Capital multiplied by nine percent (9%) (the "**Class B Invested Capital Extension Payment**"); and (ii) the Company shall have the right, at any time, to repay all or a portion of the Class B Invested Capital, provided that the amount of the required Class B Invested Capital Extension Payment shall be recalculated on such repayment date and the excess amount previously paid as a Class B Invested Capital Extension Payment and applicable for the period between the repayment date and the then current Class B Invested Capital Repayment Date shall be credited on the repayment date against the Class B Invested Capital then due and owing; (iii) the Class B Member will be entitled to an amount equal to one and one-half percent (1.5%) per month of the Class B Invested Capital (the "**Class B Preferred Return**") from the date the Class B Invested Capital is funded, which the Company will pay through monthly distributions, by check or wire transfer delivered to the Class B Member on or before the 20th of each month (or the next business day if the 20th falls on a Saturday, Sunday, or national holiday); provided, however, the first month's distribution will be prorated from the date the Class B Invested Capital is funded to the 20th of the next month based on a 30 day month, 360-day year (for the avoidance of doubt, if the Class B Invested Capital is $30,000,000.00, the monthly distribution of the Class B Preferred Return will be $450,000.00). The Company shall have the right, at any time, to repay the entire, or a portion of the, then outstanding Class B Invested Capital prior to the Class B Repayment Date (as it may be extended) and in such event (a) the Class B Preferred Return through the date of payment shall be prorated from the date of the prior payment of the Class B Preferred Return to the date of prepayment in full of the outstanding Class B Invested Capital, based on a 30-day month, and shall be due concurrently with the prepayment in full of the Class B Invested Capital; provided, however, that if the Class B Invested Capital is prepaid within three months of the Effective Date, the Company shall be required to make a payment to the Class B Member at least equal to three months' of Class B Preferred Return, less the Class B Preferred Return paid prior to such date and less any balance in the Class B Member Reserve as defined below (the "**Minimum Preferred Return Payment**"). In consideration for the Class B Member's Class B Invested Capital, in addition to paying

up-front all costs and expenses associated with preparation and documentation of the investment by the Class B Member of the Class B Invested Capital (including without limitation reasonable attorney's fees), the Members have agreed the Class B Member will be entitled to withhold from the Class B Member's disbursement of the Class B Member's Class B Invested Capital to the Company: (A) $1,350,000 from the Class B Member's Class B Invested Capital (the "**Class B Member Reserve**"), plus (B) an additional amount of $7,500 as the Class B Member's administrative fee; provided, however, that in no event shall such retained amounts factor into the calculation of the outstanding Class B Invested Capital or the Class B Preferred Return under this **Appendix "B"**. At the time the Company tenders payment in full of the Class B Invested Capital (plus the Minimum Preferred Return Payment, if applicable), so long as no Company Default exists and is continuing, the Company will be entitled to a credit in the amount of the Class B Member Reserve and, (b) if applicable, the then most recent Class B Invested Capital Extension Payment shall be pro-rated on a 360-day basis and the amount applicable for the period between the repayment date and the then current Class B Invested Capital Repayment Date shall be credited on the repayment date against the then outstanding Class B Invested Capital then due and owing to the Class B Member.

    b. <u>Distributions to Class A Members</u>. Notwithstanding anything to the contrary in the Agreement including, without limitation, Article III thereof, and the Act, there will be no distributions made by the Company to the Class A Members; provided, however, so long as no Company Default (as defined in Section 2 of this Appendix "B", below) exists and is continuing, the foregoing shall not preclude payment or setting aside reserves for expenses of the Company in the ordinary course of business.

    c. <u>Obligation to Make Additional Capital Contribution</u>. Notwithstanding anything to the contrary in the Agreement, and the Act, Class B Member shall have no obligation to make any additional capital contributions to the Company and the failure of Class B Member to make any such additional capital contribution shall not affect Class B Member's rights and interest in the Company.

    d. <u>Capital and Income Accounts</u>. Notwithstanding anything to the contrary in the Agreement, the terms of Article III of the Agreement shall not apply to the Class B Member. The Company shall be obligated to make all distributions to Class B Member in accordance with the terms of this **Appendix "B"** and the Company shall establish a separate capital and income account for Class B Member reflecting the Class B Invested Capital and any distributions made hereunder; provided, however, the income attributable to the Class B Member will be the same as the amount of the cash distributed to the Class B Member pursuant to Section 1(a) of this **Appendix "B"**, above. Further, Class B Member shall not be entitled to share in any profits or losses of the Company (except as may be paid to Class B Member as a payment under Section 1(a) of this **Appendix "B"**, above).

    2. <u>**Class B Members' Rights and Remedies Following Default**</u>. Class B Member shall have the rights set forth in subsections (a) and (b), below upon a Company Default (as defined below). As used herein, a "**Company Default**" shall be defined as: (i) any failure of the Company and/or the Managing Member to make any of the required distributions/payments to the Class B Member as set forth in Section 1(a) of this **Appendix "B"**, which distributions/payments are not paid within five (5) days following the delivery by Class B Member to the Company of a written notice specifying such failure; and/or (ii) any breach by the Company and/or the Managing Member of any of the nonmonetary covenants and conditions set forth in this **Appendix "B"**, which breach is not cured within thirty (30) days following the delivery by Class B Member to the Company of a written notice specifying such breach; provided, however, that if such nonmonetary breach cannot be remedied by the payment of a sum of money and not capable of being remedied within thirty (30) days, then the Company and the Managing Member shall have an additional period of time within which to remedy such failure provided that the

Company and/or the Managing Member commences their cure within such thirty (30) day period and diligently pursues such cure to completion. In addition to any amounts that may be owed to Class B Member hereunder, upon a Company Default, Class B Member shall also be entitled to receive from the Company (A) interest on any such past due distributions/payments at the rate of twenty-three percent (23%) per annum compounded monthly, and (B) any and all actual, reasonable, out-of-pocket expenses, costs and fees (including, without limitation, reasonable attorneys' fees and costs) arising from the failure of the Company to pay to Class B Member any amounts due hereunder, as well as arising from Class B Member's enforcement of its rights and privileges under this Agreement including, without limitation, this **Appendix "B"** (collectively, the **"Additional Class B Payments"**). Following a Company Default, the Company shall be required to repay in full the Class B Invested Capital, plus the Class B Preferred Return earned to such date (subject to the Minimum Preferred Return Payment), plus all Additional Class B Payments (if any) to the Class B Member immediately upon demand.

        a.     <u>Pursue Rights Under Guaranty</u>. Following a Company Default Class B Member may proceed against the Guarantor (as defined below) under the terms of that certain Guaranty dated as of the date hereof, by Natin Paul, an individual, and Natin Paul, Trustee of the Natin Paul Management Trust Dated February 29, 2012 (hereinafter collectively called **"Guarantor"**), for the benefit of Class B Member (**"Guaranty"**), and, following such election and the repayment of all amounts due and payable to Class B Member under this Agreement including, without limitation, the then outstanding Class B Invested Capital, plus the Class B Preferred Return earned to such date (subject to the Minimum Preferred Return Payment), plus all Additional Class B Payments (if any), the terms of Section 3 of this **Appendix "B"** shall apply as if the Company had repaid Class B Member the then outstanding Class B Invested Capital, plus the Class B Preferred Return earned to such date (subject to the Minimum Preferred Return Payment), plus all Additional Class B Payments (if any).

        b.     <u>Sell the Property and Pursue Rights under the Guaranty, if any</u>. Following a Company Default, Class B Member shall also have the right to elect (in its sole discretion), pursuant to a written notice to the Company, to: (i) require the Company, as Managing Member of World Class CMBS I, to have the Property sold in accordance with the requirements set forth below; (ii) have the Company as Managing Member of World Class CMBS I to use the Net Sale Proceeds (as defined below) to repay Class B Member all amounts due and payable to Class B Member under this Agreement including, without limitation, the then outstanding Class B Invested Capital, plus the Class B Preferred Return earned to such date (subject to the Minimum Preferred Return Payment), plus all Additional Class B Payments (if any); and (iii) if, and only if, the Net Sale Proceeds are insufficient to entirely pay off all amounts due and payable to Class B Member under this Agreement including, without limitation, the then outstanding Class B Invested Capital, plus the Class B Preferred Return earned to such date (subject to the Minimum Preferred Return Payment), plus all Additional Class B Payments (if any), Class B Member shall be entitled, following the payment of such Net Sale Proceeds to Class B Member, to pursue the Guarantor under the Guaranty for any difference between (A) all amounts due and payable to Class B Member under this Agreement including, without limitation, the then outstanding Class B Invested Capital, plus the Class B Preferred Return earned to such date (subject to the Minimum Preferred Return Payment), plus all Additional Class B Payments (if any), and (B) the amount of Net Sales Proceeds; provided, however, Class B Member's rights to proceed under this subsection (b) shall only survive until Class B Member receives all amounts due and payable to Class B Member under this Agreement including, without limitation, the then outstanding Class B Invested Capital, plus the Class B Preferred Return earned to such date (subject to the Minimum Preferred Return Payment), plus all Additional Class B Payments (if any) and, following the payment of such amounts pursuant to the Guaranty or otherwise, the Company shall no longer be required to sell the Property even if Class B Member has previously invoked such right under this subsection (b) and the terms of Section 3 shall apply as if the Company had repaid Class B Member the then outstanding Class B Invested Capital, plus the Class B Preferred Return

ACTIVE/80750130.4
4826-5796-9954

earned to such date (subject to the Minimum Preferred Return Payment), plus all Additional Class B Payments (if any); provided, further, if, and only if, the Net Sale Proceeds are equal to or greater than all amounts due and payable to Class B Member under this Agreement including, without limitation, the then outstanding Class B Invested Capital, plus the Class B Preferred Return earned to such date (subject to the Minimum Preferred Return Payment), plus all Additional Class B Payments (if any), then (I) the Company shall be entitled to keep any Net Sale Proceeds in excess of the then outstanding Class B Invested Capital plus all Additional Class B Payments (if any), and (II) upon payment to Class B Member of all amounts due and payable to Class B Member under this Agreement including, without limitation, the then outstanding Class B Invested Capital, plus the Class B Preferred Return earned to such date (subject to the Minimum Preferred Return Payment), plus all Additional Class B Payments (if any), the terms of the Guaranty will automatically become null, void and of no further force or effect and the terms of Section 3, below, shall apply. As used herein, the term "**Net Sales Proceeds**" shall mean the sum of (x) the gross sales price received for the Property, minus (y) the amount paid to the holders of all encumbrances and liens on the Property including, without limitation, the then holder of the first-lien security interest in the Property, minus (z) all costs and expenses incurred by the Company in completing the sale of the Property including, without limitation, escrow fees and charges, title charges and fees (including, without limitation, the cost of title insurance and endorsements), recording fees, transfer taxes, brokerage commissions and legal fees and costs. In connection with the sale of the Property (as provided above), the following terms and conditions shall apply: (1) Class B Member shall engage a reputable investment broker or brokers working for a regionally recognized investment brokerage firm, which investment broker(s) shall have a minimum of ten (10) years of experience in the marketing and sale of real estate securities; (2) the sale of the Property shall be marketed by such broker(s) on a wide scale; (3) Class A Members shall reasonably cooperate with all marketing and sales efforts and shall be consulted in connection with any proposed negotiations for the sale of the Property; (4) Class B Member shall use and shall cause the brokers engaged to use commercially reasonable efforts to maximize the purchase price to be received for the Property; (5) such sale of the Property shall be completed in an arm's length transaction on customary terms as more particularly set forth in purchase documentation prepared by the Company's counsel; (6) the purchaser shall not be an affiliate of Class B Member; (7) such sale shall be completed on an "as-is", "where is" basis; and (8) such sale shall be completed as soon as reasonably possible subject to customary due diligence and escrow periods.

3.      **Rights Following Re-Payment of Class B Invested Capital, plus the Class B Preferred Return earned to such date (subject to the Minimum Preferred Return Payment), plus all Additional Class B Payments (if any)**. Notwithstanding anything to the contrary in the Agreement and the Act, Class B Member hereby acknowledges and agrees that, effective as of the date on which it has received the repayment in full of the Class B Invested Capital, plus the Class B Preferred Return earned to such date (subject to the Minimum Preferred Return Payment), plus all Additional Class B Payments (if any) and any related Class B Invested Capital Extension Payments then outstanding (as the case may be) (hereinafter, such date shall be referred to as the "**Withdrawal Effective Date**"): (a) such Class B Member shall be deemed to have irrevocably withdrawn from the Company (without any further notice or demand to, or acknowledgment by, such Class B Member); (b) Class B Member's entire ownership interest in the Company, which collectively includes the right to receive any further distributions or payments, any right to vote or participate in the management of the Company, and any right to information concerning the business and affairs of the Company, as provided in the Agreement (including, without limitation, this **Appendix "B"**) and under the Act shall immediately and automatically terminate as of the Withdrawal Effective Date; (c) such Class B Member shall have no further right to receive any future distributions from the Company, any future allocations of profits or losses, or any other funds or assets of the Company, nor shall such Class B Member be entitled to any other rights, powers or privileges granted to such Class B Member under this Agreement or the Act (unless the Act expressly provides that such right, power or privilege shall survive the Class B Member's

withdrawal from the Company); and (d) the existence of the Company shall continue without the need for a vote of the remaining Members.  Upon the Managing Member's request, any Class B Member who has received payment in full of the Class B Invested Capital, plus the Class B Preferred Return earned to such date (subject to the Minimum Preferred Return Payment), plus all Additional Class B Payments (if any) shall execute an acknowledgment of withdrawal; provided, however, such Class B Member's execution of the acknowledgment of withdrawal (or any other written instrument) shall not be required or necessary to effectuate the withdrawal of such Class B Member pursuant to this Section, which shall be automatically effectuated upon the Withdrawal Effective Date. For the avoidance of doubt, following the Withdrawal Effective Date, the terms and provisions of the Agreement may be modified, amended or waived at any time and from time to time by the Manager in its sole discretion.

4.   **Class B Member's Consent.**

a.   <u>Actions Requiring Class B Member's Consent</u>.  Notwithstanding anything to the contrary in the Agreement and the Act, the Class B Member's prior written consent shall be required (which consent or approval shall not be unreasonably withheld by the Class B Member) for the Company and/or the Managing Member to do any of the following:

i.   <u>Sales</u>.  (A) sell the Company, (B) sell the Company's membership rights in World Class CMBS I, LLC, and/or (C) cause the sale by World Class CMBS I, LLC of the Property, unless the Net Proceeds from any such sale will satisfy or exceed all the required distributions to the Class B Member set forth in this Agreement including, without limitation, all of the then outstanding Class B Invested Capital, plus the Class B Preferred Return earned to such date (subject to the Minimum Preferred Return Payment),  plus all Additional Class B Payments (if any).  In connection with the foregoing, the Company shall provide the Class B Member with at least ten (10) days advance written notice of any such proposed sale, which notice shall specify the amount of Net Proceeds anticipated from any such sale and, prior to such sale, all other consents from the Class B Member, if any, required hereunder shall have been received.  This section shall not apply to any sale of the Property made pursuant to Section 2(b), above.

ii.   <u>Financings or Refinancings</u>.  Borrow any new funds which are or will be secured by the Property, unless such the proceeds of such funds shall be used to repay in full the Class B Invested Capital, Class B Preferred Return (if any) and all Additional Class B Payments (if any).

iii.   <u>Transfer of Class A Membership Interests</u>.  Permit the transfer of Class A Member interests in the Company except to an Affiliate of the Member.  As used herein, **"Affiliate"** means (A) any Person directly or indirectly controlling, controlled by or under common control with the person specified, (B) any Person owning or controlling ten percent (10%) of more of the outstanding voting securities or beneficial interests of the Person specified, (C) any officer, director, partner, trustee or member of the immediate family of the Person specified, (D) if the Person specified is an officer, director, general partner or trustee, then any corporation, partnership or trust for which that Person acts in that capacity, or (E) any Person who is an officer, director, general partner, trustee or holder of ten percent (10%) or more of the outstanding voting securities or beneficial interests of any Person described in clauses (A) through (E). The term **"control"** (including the term "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

iv.   <u>Admission of New Class A Members</u>.  Admit any new Class A Members.

ACTIVE/80750130.4
4826-5796-9954

        v.    <u>Actions by Managing Member</u>.  Cause World Class CMBS I, LLC to acquire any new assets and/or interests in any other companies or entities.

        vi.    <u>Withdrawal of World Class Holdings, LLC</u>.  Permit World Class Real Holdings, LLC to resign or withdraw as Managing Member of the Company except in cases of death or disability of Natin Paul.

        vii.    <u>Amendments</u>.  Amend, supplement or modify this Agreement and/or the Articles of Organization; provided, however, the prior written consent of all of the Class A Members will also be required for any such amendments.

        viii.    <u>Amendments to World Class CMBS I, LLC</u>. Cause World Class CMBS I, LLC to amend, supplement or modify the World Class CMBS I, LLC Operating Agreement and/or the Articles of Organization; provided, however, the prior written consent of all of the Class A Members and the Members of World Class CMBS I, LLC will also be required for such amendments.

        ix.    <u>Appointment of Accountant</u>. Appoint, or cause the appointment of, any accountant for the Company or for World Class CMBS I other than Armanino, LLP.

        b.    <u>Consent of Class B Member</u>.  Whenever the consent or the approval of the Class B Member is required hereunder, then, except as expressly set forth herein, the following shall apply:  (i) such consent or approval shall be given or reasonably withheld within ten (10) business days after Class B Member has received a written request for its consent or approval (along with any supporting materials, notices or documents); and (ii) Class B Member shall be deemed to have consented or approved (as requested) if Class B Member fails to reasonably withhold its consent within such ten (10) business day period.

5.    <u>**Managing Member**</u>.

        a.    <u>Removal for Cause</u>.  Notwithstanding anything to the contrary in the Agreement and the Act, the Class B Member may remove the Managing Member for cause, which removal shall be effected by the vote of the Class B Member at a meeting called expressly for that purpose (as permitted in Section 6, below).  For purposes of this Section, **"for cause"** shall mean fraudulent or dishonest acts or gross abuse of authority or discretion.

        b.    <u>Removal Following a Company Default</u>.  Notwithstanding anything to the contrary in the Agreement and the Act, upon a Company Default, the Class B Member may remove the Managing Member and terminate Managing Member and any of its Affiliates as agent for the Company, and may appoint itself as Managing Member, upon a written notice delivered by the Class B Member to Managing Member and all of the Class A Members.

        c.    <u>Reports and Budgets</u>.  Notwithstanding anything to the contrary in the Agreement and the Act, the Company agrees to provide to Class B Member, promptly following their completion: (i) copies of the Company's monthly, quarterly and annual financial statements in the form customarily prepared by the Company; and (ii) copies of the Company's annual and shorter term budgets for the Company, Property and/or World Class CMBS I, LLC, if any.

6.    <u>**Meetings**</u>.  Notwithstanding anything to the contrary contained in the Agreement and the Act, Class B Member shall have the right to call a meeting of the Members and such meeting shall be held in accordance with the terms of such section.

ACTIVE/80750130.4
4826-5796-9954

7.    **Intentionally Omitted**.

8.    **Voting**.  Notwithstanding anything to the contrary in the Agreement and the Act, the vote of a majority in interest of the Members shall mean and require the vote of (i) the majority in interest of the Class A Members, **and** (ii) the Class B Member.

9.    **Intentionally Omitted**.

10.   **Indemnification**.  Notwithstanding anything to the contrary in the Agreement and the Act, the Company shall only be required to indemnify the Class B Member against claims, demands, liabilities, causes of actions, losses, costs or expenses (collectively "**Claims**") brought against or incurred by the Class B Member as a Member of the Company and only where such Claims are not the result of the Class B Member's gross negligence or willful misconduct.  For the avoidance of doubt, the Company shall not be required to indemnify, protect, defend or hold Class B Member harmless against any Claims brought against or incurred by Class B Member in any capacity other than as a Member. Nothing in this Section 10 shall alter the rights of the Class B Member to pursue any rights under the Guaranty.

11.   **Notices**.  Any notice required or permitted to be given under the terms of this Appendix "B" shall be in writing and either shall be mailed by certified mail, postage prepaid, return receipt requested, or sent by overnight air courier service, or personally delivered to a representative of the receiving party.  All such communications shall be mailed, sent or delivered, addressed to the party for whom it is intended at its address set forth below.

If to the Company
or to the Managing Member:        Natin Paul
                                  c/o World Class Holdings, LLC
                                  401 Congress Avenue, 33rd Floor
                                  Austin, TX 78701

With copy to:                     World Class Capital Group LLC
                                  540 Madison Avenue, 29th Floor
                                  New York, NY  10022
                                  Attn: Sheena Paul

If to Class B Member:             HAR-CMBS I, LLC
                                  c/o Armanino, LLP
                                  11766 Wilshire Boulevard, 9th Floor
                                  Los Angeles, CA 90025
                                  Attention:  Harvey Bookstein

with a copy to:                   Law Office of Martin N. Burton
                                  2026 Hilldale Drive
                                  La Canada, CA  91011
                                  Attention:  Martin N. Burton, Esq.

Any communication so addressed and mailed shall be deemed to be given on the earliest of (a) when actually delivered, (b) on the first business day after deposit with a reputable overnight air courier service (Federal Express and UPS are each agreed to be a reputable overnight air courier service), or (c) on the third business day after deposit in the United States mail, postage prepaid, in each case to the address of

ACTIVE/80750130.4
4826-5796-9954

the intended addressee, and any communication so delivered in person shall be deemed to be given when receipted for by, or actually received by Investor or Guarantor, as the case may be.  Any party may designate a change of address by written notice to the other by giving at least seven (7) days prior written notice of such change of address.

ACTIVE/80750130.4
4826-5796-9954

# EXHIBIT 2

## GUARANTY

$30,000,000                                                                    December 7, 2016

The undersigned, Natin Paul, an individual, and Natin Paul, Trustee of the Natin Paul Management Trust Dated February 29, 2012 (individually and collectively, "**Guarantor**"), are executing this Guaranty of Capital Contribution ("**Guaranty**") to induce HAR-CMBS I, LLC, a Delaware limited liability company ("**Investor**"), to make a Capital Contribution in the amount of $30,000,000 (the "**Capital Contribution**") to World Class CMBS I MM, LLC (the "**World Class CMBS I Managing Member**"), pursuant to the terms of that certain Limited Liability Company Agreement for World Class CMBS I MM, LLC (the "**Operating Agreement**").

## RECITALS

A.      Pursuant to the terms of the Operating Agreement, including without limitation Appendix "B" thereof, the World Class CMBS I Managing Member has agreed to repay the Capital Contribution of Investor on a preferred basis, plus a preferred return (the "**Preferred Return**") through monthly distributions, plus any and all other amounts payable to the Investor under the terms of the Operating Agreement, including without limitation Appendix "B" thereof (collectively, the "**World Class CMBS I Managing Member Payment Obligations**").

B.      As a condition to Investor making the Capital Contribution, Guarantor is required to execute and deliver to Investor this Guaranty. All capitalized terms used but not defined herein shall have the same meaning ascribed to such terms under the Operating Agreement.

1. **Guaranty.**  Guarantor unconditionally, jointly and severally, guarantees to Investor the full repayment to Investor of the Capital Contribution, the full payment of the Preferred Return including without limitation payment of any and all monthly distributions, and the full performance of all of the World Class CMBS I Managing Member Payment Obligations pursuant to the Operating Agreement and under all modifications, renewals and extensions of the Operating Agreement, whether the indebtedness and obligations described therein be voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and whether the World Class CMBS I Managing Member may be liable individually or jointly with others or whether recovery upon such indebtedness or obligations may be or hereafter become barred by any statute of limitations, or whether such indebtedness may be or hereafter become otherwise unenforceable.  All such indebtedness and obligations are referred to in this Guaranty as the "**Indebtedness**," and will be payable by each Guarantor to Investor immediately on demand (collectively, the "**Guaranteed Obligations**") in the event of any default of the World Class CMBS I Managing Member (beyond all applicable notice and/or cure periods) with respect to the Indebtedness or any part thereof, and in any event failure to repay the Capital Contribution within two (2) years of the date the Capital Contribution is funded or for any extended time period as provided for in the Operating Agreement. Without limiting the foregoing, full payment of the Indebtedness of the World Class CMBS I Managing Member to Investor shall, whether or not then otherwise due or payable in full by the World Class CMBS I Managing Member, be due and owing in full by the Guarantor to Investor upon (a) the death or dissolution (as applicable), liquidation, insolvency or

business failure of, or any assignment for the benefit of creditors by, or commencement of any bankruptcy, reorganization, receivership, moratorium or other debtor relief proceedings by or against the World Class CMBS I Managing Member or Guarantor; or (b) the appointment of a receiver for, or the attachment, sequestration, restraint of or making or levying of any order of court or legal process affecting any real or personal property of the World Class CMBS I Managing Member or any Guarantor, and in any such event Guarantor unconditionally promises to pay such Indebtedness to Investor or order, on demand, in lawful money of the United States. Notwithstanding the foregoing or anything to the contrary herein, the full payment of the Indebtedness of the World Class CMBS I Managing Member to Investor shall not be due and owing in full by the Guarantor following the death of Guarantor provided that, within six (6) months of the death of Guarantor, the estate or surviving trust of Guarantor provides Investor with one or more substitute guarantors whose financial condition in the aggregate is reasonably satisfactory to Investor and which substitute guarantors are willing to execute a guaranty of the Guaranteed Obligations substantially in the form hereof.

2.     **Rights of Investor.**  Guarantor authorizes Investor at any time in its discretion to modify, amend, supplement, renew, extend, accelerate or otherwise alter any of the terms of the Indebtedness, to take and hold any security for the Indebtedness or this Guaranty, and to accept additional or substituted security, to subordinate, compromise, waive or release any security, to apply such security and direct the order or manner of sale thereof, to release the World Class CMBS I Managing Member of its liability for all or any part of the Indebtedness, to release, substitute or add any one or more guarantors or endorsers, and to assign this Guaranty in whole or in part.  Investor may take any of the foregoing actions upon any terms and conditions as Investor may elect, without giving notice to Guarantor or obtaining the consent of Guarantor and without affecting the liability of Guarantor to Investor.

3.     **Independent Obligations.**  Guarantor's obligations under this Guaranty are independent of those of the World Class CMBS I Managing Member.  Investor may bring a separate action against any Guarantor without first proceeding against the World Class CMBS I Managing Member or any other person or any security held by Investor and without pursuing any other remedy.  Investor's rights under this Guaranty will not be exhausted by any action by Investor until all of the Indebtedness and all other obligations of the World Class CMBS I Managing Member under the Operating Agreement (the **"Other Obligations"**) have been fully paid and/or performed.

4.     **Waivers of Defenses.**  Guarantor waives any defense to the enforcement of this Guaranty arising by reason of:

     (a)     any present or future federal, state or local laws, rules, regulations, ordinances or codes, including without limitation, those of California (collectively, **"Laws"**), or orders affecting the terms of, or Investor's remedies with respect to, any of the Guaranteed Obligations, Other Obligations or security;

     (b)     the absence or cessation of personal liability of World Class CMBS I Managing Member or any affiliate of World Class CMBS I Managing Member with respect to any of the Guaranteed Obligations or Other Obligations;

-2-

(c)    the failure of any other person or entity to execute this Guaranty or any other guaranty or agreement;

(d)    the failure of World Class CMBS I Managing Member or any affiliate of World Class CMBS I Managing Member to properly execute the Operating Agreement or otherwise comply with applicable legal formalities;

(e)    the unenforceability or invalidity of any of the Guaranteed Obligations or Other Obligations, or the lack of perfection or failure of priority or any other loss or impairment of any security;

(f)    any discharge or release of World Class CMBS I Managing Member or any affiliate of World Class CMBS I Managing Member of any of the Guaranteed Obligations and Other Obligations or any impairment or suspension of any remedies of Investor, whether resulting from any act or omission of Investor or any other person or entity or by operation of law or otherwise;

(g)    any bankruptcy, insolvency or reorganization of World Class CMBS I Managing Member or any affiliate of World Class CMBS I Managing Member or any disability or other defense of World Class CMBS I Managing Member or any affiliate of World Class CMBS I Managing Member with respect to any of the Guaranteed Obligations, Other Obligations or security;

(h)    any failure of Investor to disclose to the Guarantor any information relating to the financial condition, operations, properties or prospects of World Class CMBS I Managing Member or any affiliate of World Class CMBS I Managing Member now or in the future known to Investor (the Guarantor waiving any duty on the part of Investor to disclose such information);

(i)    any failure of Investor to monitor proper application of Capital Contribution funds or compliance with the Operating Agreement, or to preserve, insure or protect any security or any subrogation, contribution or reimbursement rights of the Guarantor;

(j)    any lawful application of proceeds or payments received by Investor to obligations other than the Guaranteed Obligations; or

(k)    any other lawful action by Investor, whether authorized by this Guaranty or otherwise, or any omission by Investor or other failure of Investor to pursue, or any delay in pursuing, any other remedy in Investor's power.

Guarantor further waives: (i) any defense to the recovery by Investor against Guarantor of any deficiency or otherwise to the enforcement of this Guaranty based upon Investor's election of any remedy against Guarantor or World Class CMBS I Managing Member or any affiliate of World Class CMBS I Managing Member, including the defense to enforcement of this Guaranty (the so-called "Gradsky" defense) which, absent this waiver, Guarantor would have by virtue of an election by Investor to conduct a non-judicial foreclosure sale (also known as a "trustee's sale") or its equivalent of any real property security for any of the Guaranteed Obligations and Other Obligations, it being understood by Guarantor that any such non-judicial foreclosure sale will destroy, by operation of California Code of Civil Procedure Section 580(d), all rights of any

-3-

party to a deficiency judgment against the World Class CMBS I Managing Member or any other World Class CMBS I Managing Member, and, as a consequence, will destroy all rights which Guarantor would otherwise have (including the right of subrogation, the right of reimbursement, and the right of contribution) to proceed against the World Class CMBS I Managing Member and/or any other World Class CMBS I Managing Member; (ii) any defense or benefits that may be derived from California Code of Civil Procedure Sections 580a, 580d or 726, and all other anti-deficiency and one form of action defenses under the Laws of California; (iii) any right to a fair value hearing under California Code of Civil Procedure Section 580a, or any other similar Law, to determine the size of any deficiency owing (for which Guarantor would be liable hereunder) following a non-judicial foreclosure sale or its equivalent; (iv) any defense or benefits that may be derived from California Civil Code Sections 2808, 2809, 2810, 2819, 2845, 2849 or 2850, and all other suretyship defenses it would otherwise have under the Laws of California; (v) all benefits of any statute of limitations affecting the Guarantor's liability under or the enforcement of this Guaranty or any of the Guaranteed Obligations and Other Obligations; (vi) all setoffs and counterclaims; (vii) promptness, diligence, presentment, demand for performance and protest; (viii) notice of nonperformance, default, acceleration, protest or dishonor; (ix) except for any notice otherwise required by applicable Laws that may not be effectively waived by the Guarantor, notice of sale or other disposition of Security; and (x) notice of acceptance of this Guaranty and of the existence, creation or incurring of new or additional Indebtedness, and all other notices of any kind with respect to any of the Guaranteed Obligations and Other Obligations. Without limiting the foregoing, Guarantor waives all rights and defenses arising out of an election of remedies by Investor, even though that election of remedies, such as a non-judicial foreclosure with respect to security for the Indebtedness, has destroyed the Guarantor's rights of subrogation and reimbursement against the World Class CMBS I Managing Member by the operation of Section 580d of the Code of Civil Procedure or otherwise.

Without limiting the foregoing, or anything else contained in this Guaranty, Guarantor waives all rights and defenses that the Guarantor may have because the Indebtedness is secured by real property. This means, among other things:

(A)    The Investor may collect from the Guarantor without first foreclosing on any real or personal property collateral pledged by the World Class CMBS I Managing Member; and

(B)    If the Investor forecloses on any real property collateral pledged by the World Class CMBS I Managing Member: (1) the amount of the Indebtedness may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (2) the Investor may collect from the Guarantor even if the Investor, by foreclosing on the real property collateral, has destroyed any right the Guarantor may have to collect from the World Class CMBS I Managing Member.

This is an unconditional and irrevocable waiver of any rights and defenses the Guarantor may have should the Indebtedness be secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Sections 580a, 580b, 580d or 726 of the California Code of Civil Procedure or comparable Laws.

-4-

5.    **Waiver of Subrogation.**  Guarantor waives the Guarantor's rights of subrogation and reimbursement and any other rights and defenses available to the Guarantor by reason of Sections 2787 to 2855, inclusive, of the California Civil Code, including (a) any defenses the Guarantor may have to its obligation under this Guaranty by reason of an election of remedies by Investor, and (b) any rights or defenses the Guarantor may have by reason of protection afforded to the World Class CMBS I Managing Member with respect to the obligation so guaranteed pursuant to the anti-deficiency or other Laws limiting or discharging the World Class CMBS I Managing Member's indebtedness, including, without limitation, Section 580a, 580b, 580d, or 726 of the Code of Civil Procedure.  Guarantor shall not exercise, and hereby waives, any rights of subrogation, contribution, indemnity or reimbursement against any other World Class CMBS I Managing Member, and waives any right to enforce any remedy which Investor now has or may in the future have against any other World Class CMBS I Managing Member and any benefit of, and any right to participate in, any security or any of the Guaranteed Obligations or Other Obligations now or in the future held by Investor.  If the Guarantor nevertheless receives payment of any amount on account of any such subrogation, contribution, indemnity or reimbursement rights or otherwise in respect of any payment or performance by the Guarantor of the Guaranteed Obligations or Other Obligations prior to payment and performance in full of all the Guaranteed Obligations or Other Obligations, such amount shall be held in trust for the benefit of Investor and immediately paid to Investor for application to the Guaranteed Obligations and Other Obligations in such order and manner as Investor may determine.

6.    **World Class CMBS I Managing Member's Financial Condition.**  Guarantor assumes full responsibility for keeping fully informed of the financial condition of the World Class CMBS I Managing Member and all other circumstances affecting the World Class CMBS I Managing Member's ability to perform its obligations to Investor and agrees that Investor will have no duty to report to Guarantor any information which Investor receives about the World Class CMBS I Managing Member's or Guarantor's financial condition or any circumstances bearing on its ability to perform.

7.    **Representations of the Guarantor.**  The Guarantor represents and warrants to Investor that:

        (a)    this Guaranty is executed at the request of the World Class CMBS I Managing Member;

        (b)    the Guarantor has established adequate means of obtaining from World Class CMBS I Managing Member on a continuing basis information pertaining to, and is now and on a continuing basis will be completely familiar with, the financial condition, operations, properties and prospects of World Class CMBS I Managing Member;

        (c)    the Guarantor has received and approved the Operating Agreement; and

        (d)    no oral promises, assurances, representations or warranties have been made by or on behalf of Investor to induce the Guarantor to execute and deliver this Guaranty.

8.    **Indemnification by the Guarantor.**  Without limitation on the Guaranteed Obligations and any Other Obligations of the Guarantor or remedies of Investor under this Guaranty, the

-5-

Guarantor shall indemnify, defend and save and hold harmless Investor from and against, and shall pay on demand, any and all losses, liabilities, damages, costs, expenses and charges (including the reasonable fees and disbursements of Investor's legal counsel) suffered or incurred by Investor as a result of:

(a)     Any failure of any Guaranteed Obligations or Other Obligations to be the legal, valid and binding obligations of the World Class CMBS I Managing Member enforceable against the World Class CMBS I Managing Member in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or other similar Laws affecting the rights of creditors generally, or

(b)     Any failure of the World Class CMBS I Managing Member to pay and perform any Guaranteed Obligations or Other Obligations in accordance with the terms of such Guaranteed Obligations or Other Obligations.

9.     **Financial Information.** Upon request, Guarantor shall furnish to Investor, within ninety (90) days after the end of each of Guarantor's fiscal years, a current (as of the end of such fiscal year) balance sheet of Guarantor, in scope and detail reasonably satisfactory Investor; provided, however, the delivery of such financial information shall be expressly contingent upon and Investor shall agree to keep any such financial information confidential and shall only be permitted to use such financial information for its internal business purposes. Such financial information shall not be used by Investor for any other purpose and/or disclosed except as may be required by subpoena or otherwise by law.

10.     **Waivers and Amendments.**   No supplement to, modification or amendment of, or waiver, consent or approval under, any provision of this Guaranty shall be effective unless in writing and signed by Investor, and any waiver, consent or approval shall be effective only in the specific instance and for the specific purpose for which given.

11.     **Remedies.**   Each of the remedies provided in this Guaranty is cumulative and not exclusive of, and shall not prejudice, any other remedy provided in this Guaranty or by applicable Laws or under the Operating Agreement. Each remedy may be exercised from time to time as often as deemed reasonably necessary by Investor, and in such order and manner as Investor may reasonably determine. No failure or delay on the part of Investor in exercising any remedy shall operate as a waiver of such remedy; nor shall any single or partial exercise of any remedy preclude any other or further exercise of such remedy or of any other remedy.

12.     **Costs and Expenses.**   Guarantor shall pay to Investor on demand all actual, out-of-pocket costs, expenses and charges of Investor in connection with the enforcement of, or the exercise of any remedy or any other action taken by Investor under or in connection with, this Guaranty or the Indebtedness, including the actual, out-of-pocket fees and disbursements of Investor's legal counsel and other actual, out-of-pocket expenses.

13.     **Notices.**   Any notice required or permitted to be given under this Guaranty shall be in writing and either shall be mailed by certified mail, postage prepaid, return receipt requested, or sent by overnight air courier service, or personally delivered to a representative of the receiving

party. All such communications shall be mailed, sent or delivered, addressed to the party for whom it is intended at its address set forth below.

| | |
|---|---|
| If to Guarantor: | Natin Paul<br>c/o WC World Class CMBS I, LLC<br>401 Congress Avenue, 33rd Floor<br>Austin, TX 78701 |
| With copy to: | World Class Capital Group LLC<br>540 Madison Avenue, 29th Floor<br>New York, NY 10022<br>Attn: Sheena Paul |
| If to Investor: | HAR-CMBS I, LLC<br>c/o Armanino, LLP<br>11766 Wilshire Boulevard, 9th Floor<br>Los Angeles, CA 90025<br>Attention: Harvey Bookstein |
| with a copy to: | Law Office of Martin N. Burton<br>2026 Hilldale Drive<br>La Canada, California 91011<br>Attention: Martin N. Burton, Esq. |

Any communication so addressed and mailed shall be deemed to be given on the earliest of (a) when actually delivered, (b) on the first business day after deposit with a reputable overnight air courier service (Federal Express and UPS are each agreed to be such a service), or (c) on the third business day after deposit in the United States mail, postage prepaid, in each case to the address of the intended addressee, and any communication so delivered in person shall be deemed to be given when receipted for by, or actually received by Investor or Guarantor, as the case may be. Either party may designate a change of address by written notice to the other by giving at least seven (7) days prior written notice of such change of address.

14.   **Binding Agreement.** This Guaranty shall be binding on and inure to the benefit of the Guarantor and Investor and their respective successors and assigns, except that the Guarantor shall have no right to assign any interest under this Guaranty without the prior written consent of Investor. Investor may from time to time assign its interest under this Guaranty in whole or in part without notice to or the consent of the Guarantor.

15.   **Governing Law.** This Guaranty shall be governed by, interpreted under, construed and enforced in accordance with the laws of the State of California, irrespective of California's choice-of-law principles.

16.   **Enforceability.** Guarantor hereby acknowledges that: (a) the obligations undertaken by Guarantor in this Guaranty are complex in nature; (b) numerous possible defenses to the enforceability of these obligations may presently exist and/or may arise hereafter; (c) as part of Investor's consideration for making the Capital Contribution, Investor has specifically bargained

-7-

for the waiver and relinquishment by Guarantor of all such defenses; and (d) Guarantor has had the opportunity to seek and receive legal advice from skilled legal counsel in the area of financial transactions of the type contemplated herein.  Given all of the above, Guarantor does hereby represent and confirm to Investor that Guarantor is fully informed regarding, and that Guarantor does thoroughly understand:  (i) the nature of all such possible defenses; (ii) the circumstances under which such defenses may arise; (iii) the benefits which such defenses might confer upon Guarantor; and (iv) the legal consequences to Guarantor of waiving such defenses.  Guarantor acknowledges that Guarantor makes this Guaranty with the intent that this Guaranty and all of the informed waivers herein shall each and all be fully enforceable by Investor, and that Investor is induced to make the Capital Contribution in material reliance upon the presumed full enforceability thereof.

17.     **Consent to Jurisdiction**.  The parties hereto agree that all actions or proceedings arising in connection with this Guaranty shall be tried and litigated exclusively in the state and federal courts located in the County of Los Angeles, State of California.  This choice of venue is intended by the parties to be mandatory and not permissive in nature, thereby precluding the possibility of litigation between or among the parties with respect to or arising out of this Guaranty in any jurisdiction other than that specified in this section.  Each party hereto waives any right that it may have to assert the doctrine *forum non conveniens* or similar doctrine or to object to venue with respect to any proceeding brought in accordance with this section, and stipulates that the state and federal courts located in the County of Los Angeles, State of California, shall have *in personam* jurisdiction and venue over each of them for the purpose of litigating any dispute, controversy or proceeding arising out of this Guaranty.  Each party hereby authorizes and accepts service of process sufficient for personal jurisdiction in any action against it as contemplated by this section by means of registered or certified mail, return receipt requested, postage prepaid, to its address for the giving of notices as set forth in this Guaranty, or in the manner set forth in the section of this Guaranty pertaining to notice.  Any final judgment rendered against the party in any action or proceeding shall be conclusive as to the subject of such final judgment and may be enforced in other jurisdictions in any manner provided by law.

18.     **Legal Fees and Cost**.  If any party to this Guaranty institutes any action, suit, counterclaim, appeal, arbitration or mediation for any relief against another party, declaratory or otherwise (collectively an "Action"), to enforce the terms hereof or to declare rights hereunder or with respect to any inaccuracies or material omissions in connection with any of the covenants, representations or warranties on the part of the other party to this Guaranty, then the prevailing party in such Action, whether by arbitration or final judgment, shall be entitled to have and recover of and from the other party all actual, out-of-pocket costs and expenses of the Action, including reasonable attorneys' fees and costs (at the prevailing party's attorneys' then-prevailing rates as increased from time to time by the giving of advanced written notice by such counsel to such party) incurred in bringing and prosecuting such Action and/or enforcing any judgment, order, ruling or award (collectively, a "Decision") granted therein, all of which shall be deemed to have accrued on the commencement of such Action and shall be paid whether or not such Action is prosecuted to a Decision.  Any Decision entered in such Action shall contain a specific provision providing for the recovery of attorneys' fees and costs incurred in enforcing such Decision.  A court or arbitrator shall fix the amount of reasonable attorneys' fees and costs upon the request of either party.  Any judgment or order entered in any final judgment shall contain a specific provision providing for the recovery of all costs and expenses of suit, including

-8-

reasonable attorneys' fees and expert fees and costs (collectively "Costs") incurred in enforcing, perfecting and executing such judgment. For the purposes of this paragraph, Costs shall include, without limitation, in addition to Costs incurred in prosecution or defense of the underlying action, reasonable attorneys' fees, costs, expenses and expert fees and costs incurred in the following: (a) postjudgment motions and collection actions; (b) contempt proceedings; (c) garnishment, levy, debtor and third party examinations; (d) discovery; (e) bankruptcy litigation; and (f) appeals of any order or judgment. "Prevailing party" within the meaning of this section includes, without limitation, a party who agrees to dismiss an Action in consideration for the other party's payment of the amounts allegedly due or performance of the covenants allegedly breached, or obtains substantially the relief sought by such party.

19.   **Counterparts; Facsimile Signatures.**  This Guaranty may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. Each counterpart may consist of a number of copies hereof each signed by less than all, but together signed by all of the parties hereto.  Facsimile signatures on this Guaranty shall be deemed original signatures.  In the event this Guaranty is not executed by all the Guarantors, it shall nevertheless be binding upon the Guarantors who do execute a counterpart hereof.

20.   **Validity of Operating Agreement.**  Guarantor hereby warrants to Investor that the Operating Agreement contains the valid, binding and enforceable obligations of World Class CMBS I Managing Member in accordance with its terms and conditions.  Guarantor further warrants that there are no defenses or rights of setoff of World Class CMBS I Managing Member, and that the Indebtedness is and shall be due and payable in accordance with the Guaranteed Obligations.  It is not necessary for Investor to inquire into the powers of the World Class CMBS I Managing Member or the officers, directors, partners, trustees or agents acting or purporting to act on the World Class CMBS I Managing Member's behalf or on behalf of the Guarantor

21.   **Default.**  Investor may declare the Guarantor in default under this Guaranty if Guarantor fails to perform any of its obligations under this Guaranty (beyond all applicable notice and cure periods) or becomes the subject of any bankruptcy, insolvency, arrangement, reorganization, or other debtor-relief proceeding under any federal or state law, whether now existing or hereafter enacted that, in the case of any involuntary actions, is not dismissed within ninety (90) days after the filing thereof.

22.   **Delay; Cumulative Remedies.**  No delay or failure by Investor to exercise any rights or remedy against the World Class CMBS I Managing Member or any Guarantor will be construed as a waiver of that right or remedy.  All remedies of Investor against the World Class CMBS I Managing Member and Guarantor are cumulative.  The liability of Guarantor hereunder will in no way be affected or impaired by any failure on the part of Investor to realize upon or protect any of the Indebtedness or any collateral or security therefore, or to execute any lien upon or right of appropriation of any monies, credits or property of Guarantor possessed by Investor toward the liquidation of such Indebtedness or by any application of payments or credits thereon or by any extensions or renewals given by Investor.

-9-

23.   **Miscellaneous.**  The invalidity or unenforceability of any one or more provisions of this Guaranty will not affect any other provision.  The provisions of this Guaranty will bind and benefit the heirs, executors, administrators, legal representatives, successors and assigns of Guarantor and Investor.  Whenever the context requires, all terms used in the singular will be construed in the plural and vice versa, and each gender will include each other gender.  Headings of the sections of this Guaranty are inserted for convenience only and are not a part hereof.  The term "World Class CMBS I Managing Member" will mean both the named World Class CMBS I Managing Member and any other person or entity at any time assuming or otherwise becoming primarily liable on all or any part of the Indebtedness.

24.   **Time of Essence**.  Time is of the essence with respect to every provision of this Guaranty.

25.   **Multiple Guarantors.**  If more than one person signs this Guaranty as Guarantor, the term Guarantor shall mean each such person, the obligations of each Guarantor shall be joint, several and independent, and this Guaranty shall be construed and enforced as though each Guarantor executed a separate guaranty on the terms set forth in this Guaranty.  Any Guarantor who is married agrees that Investor may look to all of his or her community property and separate property to satisfy his or her obligations hereunder.

26.   **Nature of Guaranty.**  This Guaranty is a limited guaranty of payment and performance and not of collection, is continuing in nature and applies only to the Guaranteed Obligations (whether existing now or in the future), including (a) Guaranteed Obligations rising or accruing after bankruptcy of any person or entity related to or affiliated with World Class CMBS I Managing Member (other than Guarantor) or any sale or other disposition of any security for this Guaranty or for the obligations of any other person or entity related to or affiliated with World Class CMBS I Managing Member (other than Guarantor), and (b) any Guaranteed Obligations that survive repayment of the Capital Contribution.  This Guaranty and any security for this Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment or performance of any Guaranteed Obligations is rescinded or must otherwise be returned by Investor or any other person upon the bankruptcy, insolvency or reorganization of any person or entity related to or affiliated with World Class CMBS I Managing Member (other than Guarantor) or otherwise, all as though such payment or performance had not occurred.  The Guarantor shall have no authority to revoke this Guaranty, but if any such revocation shall be deemed to have occurred by operation of law or otherwise, the provisions of this Guaranty shall continue to apply notwithstanding such revocation.

27.   **Waiver of Jury Trial.**  TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF INVESTOR AND THE GUARANTOR WAIVE TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING (INCLUDING COUNTERCLAIMS), WHETHER AT LAW OR EQUITY, BROUGHT BY INVESTOR OR THE GUARANTOR AGAINST THE OTHER ON MATTERS ARISING OUT OF OR IN ANY WAY RELATED TO OR CONNECTED WITH THIS GUARANTY, THE GUARANTEED OBLIGATIONS, THE CAPITAL CONTRIBUTION OR ANY TRANSACTION CONTEMPLATED BY, OR THE RELATIONSHIP BETWEEN INVESTOR AND THE GUARANTOR OR ANY OTHER

-10-

PARTY AFFILIATED WITH WORLD CLASS CMBS I MANAGING MEMBER OR ANY
ACTION OR INACTION BY ANY PARTY UNDER, THE GUARANTEED OBLIGATIONS.

**"GUARANTOR":**

_____          _____
(Initials)                 (Initials)

IN WITNESS WHEREOF, Guarantor has duly executed and delivered this Guaranty as of the
date first above written.

GUARANTOR:

_____
NATIN PAUL, an individual

_____
NATIN PAUL, Trustee of the Natin Paul
Management Trust Dated February 29, 2012

-11-

**EXHIBIT 3**

**AMENDMENT TO**
**LIMITED LIABILITY COMPANY AGREEMENT**
**of**
**WORLD CLASS CMBS I MM, LLC**

**(HAR-CMBS I, LLC)**

THIS AMENDMENT TO LIMITED LIABILITY COMPANY AGREEMENT OF WORLD CLASS CMBS I MM, LLC (this "**Amendment**"), is entered into by and between World Class Holdings, LLC, a Delaware limited liability company (the "**Class A Member**") and HAR-CMBS I, LLC, a Delaware limited liability company (the "**Class B Member**"), effective as of July 25, 2019.

## R E C I T A L S

A.    On December 5, 2016, the Certificate of Formation of WORLD CLASS CMBS I MM, LLC, a Delaware limited liability company (the "**Company**"), was filed pursuant to the Act.

B.    The Class A Member, as Managing Member, and the Class B Member (collectively, the "**Members**") adopted that certain Limited Liability Company Agreement, dated as of December 7, 2016, for the Company (the "**Agreement**").

C.    Section 1.a of the Agreement requires that the Company shall pay the then total unpaid and outstanding Class B Invested Capital (originally, thirty million dollars ($30,000,000)) to the Class B Member in full no later than December 7, 2018, the Class B Invested Capital Repayment Date.

D.    As of January 21, 2019, the Company had paid a total of nineteen million dollars ($19,000,000) toward repayment of the Class B Invested Capital.

E.    The Company has continued to make monthly distributions of four hundred fifty thousand dollars ($450,000) to the Class B Member each month since the Class B Invested Capital Repayment Date.

F.    The Members desire to amend certain provisions of Appendix "B" of the Agreement ("**Appendix B**"), governing the Terms and Conditions Applicable For Class B Member, to extend the Class B Invested Capital Repayment Date and to memorialize that the monthly distributions will remain at four hundred fifty thousand dollars ($450,000) and that a portion of each such monthly distribution will be credited to repay the Class B Invested Capital, all as set forth herein.

G.    Pursuant to Section 4.a.vii of Appendix B of the Agreement, an amendment to Appendix B requires the prior written consent of the Class A Member and the Class B Member.

1

# AGREEMENT

NOW, THEREFORE, with reference to the foregoing Recitals, in consideration of the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Class A Member and the Class B Member hereby consent to and do amend Appendix B of the Agreement as follows:

1.  Section 1.a of Appendix B is amended by deleting the words "December 7, 2018" in the fourth line and replacing them with the words "August 7, 2020."

2.  Section 1.a of Appendix B is further amended by adding the following to the end of Section 1.a of Appendix B:

> "Notwithstanding anything in this Section 1.a or this Appendix "B" to the contrary, the Company shall continue to make monthly distributions of no less than four hundred fifty thousand dollars ($450,000), which amount shall be applied first to distribute the monthly Class B Preferred Return to the Class B Member and then to repay the Class B Invested Capital."

3.  Except as expressly amended and modified hereby, the Agreement and Appendix B shall not be affected in any other manner and shall remain in full force and effect as originally executed. All capitalized terms not otherwise defined or redefined herein shall have the same meaning ascribed to them in the Agreement and Appendix B.

4.  The Class A Member will promptly pay the costs and expenses associated with this Amendment including without limitation all costs and expenses of the Class B Member related to the negotiation and drafting of this Amendment, including without limitation reasonable attorney's fees associated therewith.

5.  This Amendment may be executed in two or more counterparts and by facsimile or pdf signature, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument, to be effective as of the day and year first written above.

*SIGNED ON THE FOLLOWING PAGE*

2

IN WITNESS WHEREOF, the undersigned has executed and delivered, this AMENDMENT TO THE LIMITED LIABILITY COMPANY AGREEMENT OF WORLD CLASS CMBS I MM, LLC as of the day and year first above written.

**CLASS A MEMBER**
**MANAGING MEMBER**

WORLD CLASS HOLDINGS, LLC,
a Delaware limited liability company

By: _____

    Nate Paul
    President


**CLASS B MEMBER**

HAR-CMBS I, LLC
a Delaware limited liability company

By: HAR-MANAGING ENTITY, LLC
    a California limited liability company,
    its Managing Member


By: _____
    Harvey A. Bookstein, as Trustee of the
    Harvey and Harriet Bookstein Living
    Trust u/d/t 8/11/99 for the benefit of
    Harvey A. Bookstein
Its: Managing Member

3

## GUARANTOR CONSENT

The undersigned is the Guarantor of the Class B Member Preferred Return and return of the Class B Member's Capital Contribution on a preferred basis (as defined in that certain Guaranty dated December 7, 2016 (the "**Guaranty**") and the Agreement, and collectively the "**Company Payment Obligations**"), pursuant to the Guaranty, and consents to this Amendment of Limited Liability Company Agreement of World Class CMBS I MM, LLC, and agrees that the Guaranty is in full force and effect and guarantees the repayment of the Company Payment Obligations, in accordance with the terms of the Guaranty.

GUARANTOR

_____
Natin Paul, an individual

_____
Natin Paul, Trustee of the Natin Paul
Management Trust Dated February 29, 2012

4

# EXHIBIT 4

LAW OFFICE OF MARTIN N. BURTON
2026 Hilldale Drive
La Canada Flintridge, CA 91011
(818) 421-5340
mburton@mburtonlaw.com

April 24, 2020

<u>VIA FEDERAL EXPRESS</u>

Natin Paul
c/o World Class Holdings, LLC
401 Congress Avenue, 33rd Floor
Austin, TX 78701

Cc:
World Class Capital Group LLC
767 Fifth Avenue, 16th Floor
New York, NY 10153
Attn: Sheena Paul

Re:   **<u>NOTICE OF FAILURE TO PAY</u>**

Dear Nate:

As you know, I represent HAR-CMBS I, LLC (the **"Class B Member"**). I am writing pursuant to Section 2 of Appendix "B" (**"Appendix B"**) of the World Class CMBS I MM, LLC Limited Liability Company Agreement. I am writing to notify World Class CMBS I MM, LLC (the **"Company"**) that it has failed to make certain distributions and payments as required under Section 1(a) of Appendix B. If the Company fails to make the payments described below within five (5) days following delivery of this Notice of Failure to Pay, the Class B Member will declare a Company Default and the Class B Member may exercise any or all of the rights set forth in, among other provisions, Sections 2(a), 2(b), and 5(b) of Appendix B.

Section 1(a) of Appendix B provides that the Company is to make monthly distributions of the Class B Preferred Return (as defined therein) in the amount of $450,000 monthly, and that the Class B Member will hold the amount of $1,350,000 (the equivalent of three months' distributions of Class B Preferred Return) as the Class B Member Reserve. The Amendment to Limited Liability Company Agreement of World Class CMBS I MM, LLC dated July 25, 2019 extended these requirements through August 7, 2020. However, the Company failed to make the monthly distributions of January, 2020; February, 2020; March, 2020; and April, 2020. These failures required the Class B Member to utilize the Class B Member Reserve to pay for such distributions.

Accordingly, the Class B Member hereby demands that, on or before the fifth (5th) day after the date of delivery of this Notice, the Company make payment of past-due distributions to the Class B Member in the amount of $1,800,000, and pay to the Class B Member for the Class B Member Reserve the amount of $1,350,000 which will replenish the Class B Reserve with a total of $1,350,000, to be held by the Class B Member as an "evergreen" reserve as required by Section 1(a) of Appendix B.

Natin Paul
World Class CMBS I MM, LLC
April 24, 2020
Page 2 of 2


In the event the Company fails to make such payments, the Class B Member will declare a Company Default as provided in Section 2 of Appendix B and be entitled to exercise any or all of the rights set forth in, among other provisions Sections 2(a), 2(b), and 5(b) of Appendix B.

The Class B Member further expects that, on or before May 1, 2020, the Company will make a monthly distribution in the amount of $450,000 for its May 2020 payment, and continue to make monthly distributions of $450,000 on or before the first of each month thereafter.

If you have any questions, please do not hesitate to contact me.

Yours very truly,

Martin N. Burton

Cc (via email):  Mr. Harvey Bookstein

**LAW OFFICE OF MARTIN N. BURTON**
2026 Hilldale Drive
La Canada Flintridge, CA 91011
(818) 421-5340
mburton@mburtonlaw.com

June 4, 2020

<u>VIA FEDERAL EXPRESS</u>

| | |
|---|---|
| Natin Paul | Cc: |
| c/o World Class Holdings, LLC | World Class Capital Group LLC |
| 401 Congress Avenue, 33rd Floor | 767 Fifth Avenue, 16th Floor |
| Austin, TX  78701 | New York, NY  10153 |
| | Attn: Sheena Paul |

Re:   **NOTICE OF FAILURE TO PAY**

Dear Nate:

As you know, I represent HAR-CMBS I, LLC (the **"Class B Member"**). I am writing pursuant to Section 2 of Appendix "B" (**"Appendix B"**) of the World Class CMBS I MM, LLC Limited Liability Company Agreement. I am writing to notify World Class CMBS I MM, LLC (the **"Company"**) that it has failed to make certain distributions and payments as required under Section 1(a) of Appendix B. If the Company fails to make the payments described below within five (5) days following delivery of this Notice of Failure to Pay, the Class B Member will declare a Company Default and the Class B Member may exercise any or all of the rights set forth in, among other provisions, Sections 2(a), 2(b), and 5(b) of Appendix B.

Section 1(a) of Appendix B provides that the Company is to make monthly distributions of the Class B Preferred Return (as defined therein) in the amount of $450,000 monthly, and that the Class B Member will hold the amount of $1,350,000 (the equivalent of three months' distributions of Class B Preferred Return) as the Class B Member Reserve. The Amendment to Limited Liability Company Agreement of World Class CMBS I MM, LLC dated July 25, 2019 extended these requirements through August 7, 2020. However, the Company failed to make the monthly distributions of January, 2020; February, 2020; March, 2020; April, 2020; and May, 2020. These failures required the Class B Member to utilize the Class B Member Reserve to pay, in part, for such distributions.

Accordingly, the Class B Member hereby demands that, on or before the fifth (5th) day after the date of delivery of this Notice, the Company make payment of past-due distributions to the Class B Member in the amount of $2,250,000, and pay to the Class B Member for the Class B Member Reserve the amount of $1,350,000 which will replenish the Class B Reserve with a total of $1,350,000, to be held by the Class B Member as an "evergreen" reserve as required by Section 1(a) of Appendix B.

Natin Paul
World Class CMBS I MM, LLC
June 4, 2020
Page 2 of 2

In the event the Company fails to make such payments, the Class B Member will declare a Company Default as provided in Section 2 of Appendix B, and will be entitled to exercise any or all of the rights set forth in, among other provisions Sections 2(a), 2(b), and 5(b) of Appendix B.

If you have any questions, please do not hesitate to contact me.

Yours very truly,

Martin N. Burton

Cc (via email):  Mr. Harvey Bookstein
Mr. Marc Bookstein

# EXHIBIT 5

LAW OFFICE OF MARTIN N. BURTON
2026 Hilldale Drive
La Canada Flintridge, CA 91011
(818) 421-5340
mburton@mburtonlaw.com

# NOTICE OF DEFAULT

July 6, 2020

<u>VIA FEDERAL EXPRESS</u>

Natin Paul
c/o World Class Holdings, LLC
401 Congress Avenue, 33rd Floor
Austin, TX 78701

Cc:
World Class Capital Group LLC
767 Fifth Avenue, 16th Floor
New York, NY 10153
Attn: Sheena Paul

Re:   <u>**NOTICE OF DEFAULT**</u>

Dear Nate:

As you know, I represent HAR-CMBS I, LLC (the **"Class B Member"**). I am writing pursuant to Section 2 of Appendix "B" (**"Appendix B"**) of the World Class CMBS I MM, LLC Limited Liability Company Agreement. I am writing to notify World Class CMBS I MM, LLC (the **"Company"**) that it has failed to make certain distributions and payments as required under Section 1(a) of Appendix B after five (5) days following delivery of a Notice of Non-Payment.

<u>Therefore, the Class B Member hereby declares a Company Default.</u> The Class B Member may exercise any or all of the rights set forth in, among other provisions, Sections 2(a), 2(b), and 5(b) of Appendix B.

Section 1(a) of Appendix B provides that the Company is to make monthly distributions of the Class B Preferred Return (as defined therein) in the amount of $450,000 monthly, and that the Class B Member will hold the amount of $1,350,000 (the equivalent of three months' distributions of Class B Preferred Return) as the Class B Member Reserve. The Amendment to Limited Liability Company Agreement of World Class CMBS I MM, LLC dated July 25, 2019 extended these requirements through August 7, 2020. However, the Company failed to make the monthly distributions of January, 2020; February, 2020; March, 2020; April, 2020; and May, 2020. These failures required the Class B Member to utilize the Class B Member Reserve to pay, in part, for such distributions.

On June 9, 2020, the Class B Member received your wire of $225,000, which has been applied to reduce your past due distributions. However, there remain past-due distributions owing to the Class B Member in the amount of $2,025,000, and an obligation to replenish the Reserve in the amount of

Natin Paul
World Class CMBS I MM, LLC
July 6, 2020
Page 2 of 2

$1,350,000. In addition, the Company failed to make the July 2020 payment in the amount of $450,000, which will now add to the defaulted amount. In addition, the Company is liable for any and all actual, reasonable, out-of-pocket expenses, costs and fees (including reasonable attorneys' fees and costs) arising from the failure of the Company to pay any amounts due. These fees currently exceed $4,625 and must also be paid under Section 2 of Appendix B.

The Class B Member reserves all rights to take any and all steps to enforce the Company's obligations to make distributions and pay the amounts owed to the Class B Member as required under Appendix B.

Yours very truly,

Martin N. Burton

Cc (via email):  Mr. Harvey Bookstein
                 Mr. Marc Bookstein